UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| GENTECH CONSTRUCTION, LLC, and | ) | |
| AQUATECH POOL CONTRACTOR, LLC, | ) | |
| | ) | CASE NO. 1:07-cv-192 |
| Plaintiffs, | ) | |
| | ) | Judge Carter |
| vs. | ) | |
| | ) | |
| NATARE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM

I. Introduction

This is the unfortunate account of a leaky pool liner.  A bench trial was held to determine

why the pool leaked and who was at fault.  This memorandum is the Court's findings of fact and

conclusions of law.  Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1332.  The

parties are diverse and the amount in dispute is greater than $75,000.  The Court concludes the

primary responsibility for the leaky liner lies with the defendant, Natare Corporation (Natare),

and judgment with an award of damages in the amount of $84,279.79 plus attorney's fees and

costs will be entered in favor of plaintiff AquaTech Pool Contractor, LLC (AquaTech).

II. Findings of Fact

Natare is an Indiana corporation with its offices located in Indianapolis. Siskin Hospital

in Chattanooga, Tennessee contracted with GenTech, a general contractor formed in Tennessee

with experience in a wide range of projects including fitness and rehabilitation facilities, to build

a $10 million rehabilitation and fitness facility.  Siskin hoped it to be the preeminent such facility

in the South, and GenTech intended for this project to be its signature project. The project (also referred to as "the Siskin project") was to include a fitness/rehabilitation pool and a spa. The pool and spa were to be indoor and elevated, *i.e.*, built over the parking garage. GenTech hired AquaTech as the subcontractor to build the pool and spa. The four owners of GenTech created AquaTech in 2005 because they had been so disappointed in the quality of work of other pool contractors in past jobs and felt they could obtain better quality work by creating a new subcontractor to build their pools. AquaTech is not a subdivision of GenTech; it is a separate and independent corporation.

In 2006 and 2007, Brad Carney was Vice-President and an owner of AquaTech. At the time of trial he was AquaTech's President and its only employee. Carney has a degree in mechanical engineering from the Georgia Institute of Technology and possesses expertise in hydraulics. Mr. Carney had built one pool prior to the Siskin pool. Currently, AquaTech builds eight to ten pools per year. Duane Horton is President of GenTech and one of the four owners of AquaTech. He has 13 years of experience in the construction industry. Gene Bradford, GenTech's field superintendent with twenty-eight years of construction experience, also assisted on a daily basis with the project. He was responsible for organizing, coordinating, and supervising the subcontractors; making sure jobs were completed on time and on budget; keeping the site clean; and maintaining safety on the site. He reviewed the progress of the pool and spa construction daily. The Siskin pool and spa was the first elevated pool project in which he had been involved and the fourth time he had used a vinyl liner system in a pool. Previously, he had been involved in three in-ground residential pool projects using a vinyl liner system.

Duane Horton and Brad Carney looked at many options for pool finishes before deciding on Natare's "Natatec Swimming Pool Membrane System."[1] They considered stainless steel, fiber glass and an epoxy finish. They also reviewed written product information from Natare. Natare's "Natatec PVC swimming pool lining systems" product information (Plaintiff's Trial Exhibit 1)[2] made the following claims and statements:

> **Built right, installed right and working for you!** Natare equipment and systems are available through a worldwide network of builders, distributors, and specialty contractors who are there to help carefully select and conscientiously install our products, equipment and systems to make your facility work for you.

(Emphasis in original.) (P-1, GT 417). The outside cover of the product information also contained following statement, "when it **can't leak**!" (P-1, GT 411) (emphasis added). (Stipulated Fact #19a.)

The inside cover of Natare Corporation's product information provided a chart comparing "how Natatec lining systems compare to other resurfacing methods." That chart included a discussion of the "adverse condition" of "watertightness." The product information claimed that concrete, plaster, and cementitious coatings "will crack; not watertight," describes painted surfaces as "will leak; no effect on watertightness," fiberglass coatings as "will delaminate and

---

[1] The Natatec Swimming Pool Membrane System is referred to by the parties and by Natare's own literature in various ways including the Natatec PVC swimming pool lining system, the liner system, the pool liner system, the membrane system, the pool membrane system and the liner membrane system. Liner and membrane are used interchangeably. While the Court has tried to be consistent, references within this memorandum may also vary.

[2] Hereinafter all exhibits cited are trial exhibits. The Court shall use "P" for Plaintiff's exhibits and "D" for defendant's exhibits. The Court shall cite to such exhibits in the following manner: (P - _ ). Some citations may include further notations of a Bates number if the exhibit is more than one page and the Court is citing to a specific page in that exhibit. For example, (P-2, GT 427) can be found at Plaintiff's exhibit 2 on the page which is Bates stamped GT 427.

leak in time," and ceramic tile as "may leak; crack and delaminate." Natare's product information described its membrane pool lining system as "a **watertight impervious lining**." (P-1, GT 415) (emphasis added) (Stipulated Fact #19b).

With regard to "ease of installation" of its pool lining system, Natare stated that "Natatec provides a **watertight**, attractive and easily maintained pool that will stay that way." (P-**1**, GT 415) (emphasis added) (Stipulated Fact #19c.) The product information further stated,

* "our pool liners may be installed in virtually any pool or water feature. Regardless of size or shape, our systems are fabricated on-site to insure a perfect, **watertight** fit." (Emphasis added) (P-1) (Stipulated Fact #19d) (Defendant's Response to Request To Admit # 9)[3] .

* "ideal for public pools, water parks, or any water feature – Natatec pool lining systems may be used anywhere an attractive, **watertight** and trouble-free pool surface is necessary." (Emphasis added) ( P-1) (Stipulated Fact #19e) (Response to RTA # 10) .

* "in new construction, simple, cost-efficient, non-watertight supporting structures are adequate. Our lining system provides an attractive, flexible **watertight** lining inside virtually any supporting structure." (Emphasis added) ( P-1) (Stipulated Fact #19f) (Response to RTA # 11).

―――――――――――

[3]Citations to Defendant's responses to Plaintiffs' requests to admit shall hereinafter be cited as (Response to RTA # _ ).

\*     "the Natatec system can be made to fit any shape or size. Custom cut, fitted and fuse bonded on-site, our system is tailored to each installation. Details such as inlets, drains and overflow gutters are made permanently **watertight**." (Emphasis added) ( P-1) (Stipulated Fact #19g) (Response to RTA # 12).

\*     "Natatec membrane systems • completely **watertight**." (Emphasis added) (P-1) (Stipulated Fact #19h) (Response to RTA # 13).

\*     "if it absolutely has to be **watertight or waterproof**, Natatec PVC pool lining systems offer cost-effective solutions. Technical excellence, specialized knowledge and years of critical experience are vital to success of your specialty lining project. These capabilities are standard with each Natatec lining system." (Emphasis added) (P-1; Response to RTA #14) (Stipulated Fact #19i).

\*     "by providing a **watertight** lining, our membranes reduce the energy and chemical use attributed to water lost through leakage." (Emphasis added) (P-1; Response to RTA #17) (Stipulated Fact #19j).

\*     "no matter what the structure, the Natatec system provides protection and extends pool life. Our **impervious** lining isolates the pool structure from damaging pool water." (Emphasis added) (P-1) (Response to RTA #18) (Stipulated Fact #19k).

\*     "**Built right, installed right and working for you!** Natare equipment and systems are available through a worldwide network of builders, distributors and specialty contractors who are there to carefully select and conscientiously install our products, equipment and systems to make your facility work for you." (Emphasis in original) (P-1) (Response to RTA #20) (Stipulated Fact #19l).

\*         "Natatec is custom-fitted and bonded on-site to provide an attractive, easily maintained, **totally watertight**, virtually indestructible pool surface." (Emphasis added) (P-1) (Response to RTA #21) (Stipulated Fact #19m).

The phrase "the idea that all pools are created equal just doesn't hold water" is a registered service mark for Natare Corporation. (P-1) (Response to RTA #6) (Stipulated Fact #20). Horton and Carney testified they relied on these statements in the Natare's product information in ultimately choosing Natare's "Natatec PVC swimming pool lining system" for the Siskin pool and spa.

The Natatec name is a registered trademark of Natare and is applied to a variety of aquatic equipment including the Natatec PVC liner system. (Stipulated Fact # 12). The pool lining system, is comprised of the liner material (the membrane), the flanges, and the terminations. (Stipulated Fact #18.) It does not include the pool shell over which the liner is to be placed. The liner itself is comprised of a layer of 150 mil thick polyester fleece and a 60 mil solid PVC material. (Stipulated Fact # 14). A hole in the liner must be cut for the normal pool fittings such as inlets, lights, skimmers, and drains.[4] Flanges are rings that are compressed on top of the pool liner around the fittings and anchored into the walls with screws. The purpose of a flange is to keep the liner watertight at the fitting. Terminations are strips or bars compressed over the liner where the liner ends on the wall. They are anchored to the wall with screws.

_____

[4]Drawings of a membrane termination, a typical test fitting, a typical main drain, a typical supply inlet, a typical handrail anchor, and a typical skimmer can be found in Natare's June 2006 submittals to AquaTech. *See* P-6, GT-354, GT-355, GT-356, GT-357, GT-360,and GT-361, respectively.

Natare's liner system was to be installed over a concrete shell for the Siskin project. Brad Carney testified that *before* the concrete shell was created, he spoke over the telephone with Dave Keim, Executive Vice President of Natare, and Glenn Rose, Senior Project Manager at Natare, about the type of fittings AquaTech should use in the construction of the pool and spa. Carney wanted to be sure that concrete fittings, *i.e.*, fittings installed directly into the concrete walls while the concrete was still wet, would be acceptable for Natare's liner system. Keim and Rose assured Carney concrete fittings would be acceptable. The proposed plan Natare submitted for the Siskin pool and spa specifically included the use of concrete fittings and a termination just below the coping. (*see* June 2006 Submittals, P-6, GT 357). Rose testified that the submittals were returned to Natare with a notation that a tile band would be used at the top of the wall. Rose also recalled some discussion of vinyl fittings and concrete fittings and testified at trial that Natare can successfully compress around concrete fittings. Rose further testified that he did not know AquaTech was a new and inexperienced company.

On May 15, 2006, AquaTech and Natare entered into an agreement for Natare to provide its liner system for the Siskin pool and spa for $46,805.00. (*See* Quotation and Agreement, P-2).[5] The agreement states in relevant part:

> [Natare shall] furnish and install the Natatec Swimming Pool Membrane System onto the existing swimming pool interior surfaces as scheduled below.
>
> 15'X60' Lap Pool with Integral Therapy Area
>
> 8' X 12' Hot Tub
>
> In general our offering includes the following:

---

[5]Natare submitted the Quotation and Agreement for AquaTech's review on April 10, 2006. Brad Carney signed it on May 15, 2006. (P-2).

Inspection of the existing pool surfaces to insure that a satisfactory base has been provided for the installation of the membrane system.

*       *       *

Pressure flanges and appropriate transitions shall be furnished and installed for all main drains, underwater lights, skimmers, inlet fittings, anchor sockets and other necessary membrane penetrations.

*       *       *

The membrane shall terminate at the upper perimeter of the pool, immediately beneath the coping or deck overhang.

*       *       *

We specifically do not  include, without limitation, the following:
... Concrete work, sealants, grouting or paint.

(Quotation and Agreement, P-2, GT 3-4).

 AquaTech was to pay 50% of the contract price upon delivery of the materials, 40% upon completion of the installation, and 10% sixty days after start-up. ( P-3).  In an internal memorandum dated May 23, 2006,  Dave Keim wrote Glenn Rose, as well as other Natare personnel, regarding the "Siskin Hospital Pools.  Keim wrote,  "[t]he gunite shells are complete and Gen Tech is looking for us to have someone do a 'swing by' to inspect the pools to make sure that everything looks good for the liner installation. ...Since these are new pools, in a hospital over occupied space, we should plan to have one of the Brock crews do this project." (D-69A).  The memorandum further indicated the fittings would be concrete fittings and the termination would end at the top of the wall just under the coping.  *Id.*  The Brock Corporation, Natare's first choice installer for the Siskin project, was not, however, available,  (P-67) and

Natare chose the K Company owned by Tom Krepel as the installer. Krepel had himself installed several hundred PVC liner systems and about 60 of those were in elevated pools.

GenTech was responsible for making the concrete shells for the pool and spa. Gene Bradford testified as to how the shells were created. Forms were made with wood and rebar. The floor of the pool and the spa were created by pouring concrete into forms. The walls of the spa were made using "shotcrete." Wet concrete was "shot" out of a hose under pressure into the wall forms. A six inch decorative tile band was placed around the top of the pool just under the coping. The pool has two sets of regular steps into the water with handrails and two sets of recessed steps, *i.e.*, the treads were built into the wall, with a ladder. (P-62). The spa, built in the same area as the pool, is separate from the pool and has one set of steps with two handrails. Because the pool and spa are elevated above the garage, there is a space between the walls of the building and the walls of the pool and spa which allow a person to walk or crawl around and underneath the pool and spa to observe leaks, if any exist.

Before the walls were "shot," electrical and PVC piping were placed inside the wall frames. Fittings were attached to the appropriate pipes and concrete placed around the fittings. The PVC piping was for pool drainage, and upon completion of the shell and before the liner was installed, plumbers tested the water tightness of the pipes by running soapy water through them. No leaks were found.

By letter dated September 5, 2006, Rose wrote Carney to say Natare would like to begin installation the week of October 9, 2006. In the letter, Rose noted that a tile band was being placed at the top of the pool, and he expressed no objection to the tile. (P-7). Natare shipped the

materials on September 28, 2006, and upon their arrival at the job site AquaTech paid Natare $23,402.50 (P-8).[6]

Krepel arrived in early October to begin installation. The first time he saw the concrete shell was the day he arrived for installation. He inspected the shell for any cracks, delaminating, or other problems. At this time, the tile band, the concrete fittings, the handrails for the steps, and recessed steps were already installed and in place. Krepel did not tell AquaTech or GenTech that there was any problem with the shells or any of the fixtures before he began installation of the liner system. He was not concerned about the concrete fittings as he had fitted around concrete fittings thousands of times. He did request that a tile band be placed around the recessed steps in order that he did not have to place the liner around each tread. AquaTech made this alteration as requested. Krepel testified that he asked to see a drawing of the location of the drainage pipes for the pool, and he thought the pipes were about 12 inches outside the wall. Carney testified Krepel never asked about the pipes.

First, Krepel glued a felt liner onto the concrete shell. Then he glued the PVC material onto the felt. Working by himself, Krepel laid down 12 or 14 foot pieces of liner. He used a hot air jet that blows air at about 700 degrees to seal the seams. Krepel testified he checked every seam with a cotterpin extrator to see if there was a void. If there was a void, the seam was resealed using the hot air jet. Then liquid PVC was put on each seam. Krepel put a round flange around each fitting. First he drilled holes for the anchor screws, cleaned the area, glued the flange on, and screwed it down with stainless steel screws. He used a termination bar at the top

---

[6]The 2006 invoice Natare sent AquaTech was for $27,840, the total price of all materials. Pursuant to the Quotation and Agreement, AquaTech paid Natare 50% of the total contract price of $46,805 which was $23,402.50.

of the liner to compress the liner to the concrete shell just under the tile band. Krepel was using an impact hammer drill with a 6 to 8 inch bit to screw the termination bar on top of the liner and into the concrete wall.

Krepel could not remember anything unusual about the installation. Installation was completed on or about October 19, 2006, and AquaTech paid Natare $18,965 at that time. (P-9 and P-10). Natare issued a "Certificate of Substantial Completion" on October 19, 2006 which Carney signed. ( P-9). The Certificate indicated the pool and spa had not been hydrostatically tested. (P-9). AquaTech received a written warranty from Natare on November 1, 2006. The Warranty states in relevant part:

> Natare ...expressly warrants that, commencing upon delivery of the materials to the owner, the Natare Natatec materials shall retain their integrity as a watertight membrane and not peel, flake, crack, tear, or delaminate for a period of 10 years from the effective date of the warranty.

> Natare further warrants that the Natatec Membrane System, if installed and utilized in accordance with Natare's written instructions, industry standards and proper practices, will perform in a proper manner and workmanlike manner under normal and intended use and service.

(Stipulations of Fact #15 and #16.)

Water was first placed in the pool and spa on November 8, 2006. The delay was caused by the fact that a dehumidifier was not yet installed and there would be too much moisture in the pool area to finish the painting and flooring yet to be completed. Once the dehumidifier was installed, Carney began to put water in the pool and noticed leaks right away. With one inch of water in the pool, water started dripping into the parking lot. The four main drains on the bottom of the pool were the suspected source of leaking. AquaTech contacted Natare. David Keim wrote Brad Carney on November 8, 2006:

11

As discussed, out of the spirit of cooperation and as a gesture of goodwill, Natare agrees to dispatch Tom Krepel to the referenced facility to make the modifications necessary to the lining system, following your modifying the main drains. Rather than charging you our normal rates for non-warranty work, we have agreed to bill you at the actual rates charged to us by Tom Krepel, plus 20%.

As agreed, upon receiving a copy of this fax signed by you indicating your agreement with the above, we will dispatch Tom to the project site.

(P-14). Carney signed the letter on November 11, 2006. *Id.*

At Natare's recommendation, AquaTech drained the pool, chipped out the concrete around the drains, and had the 4 drains in the bottom of the pool refitted with stainless steel flanges. Tom Krepel compressed the new stainless steel flanges around the four bottom drains. According to a "Field Report" prepared by Krepel and dated February 5, 2007, Gene Bradford told Krepel there was an excess of trash thrown into the pool and the grinding done to refit the main drains in the pool had caused it to become incredibly dirty. (Krepel Field Report, P-25A, NAT 88). Natare charged AquaTech $2,109 for this work which Natare deemed non-warranty work. (P-14 and P-15). Carney testified that AquaTech did not pay this bill.

Duane Horton testified he personally worked with Carney to discover and repair the source of the leaks. He was in the pool multiple times when it was both dry and holding water. He inspected the fittings and found loose screws in a number of fittings indicating the flanges were not compressed tightly onto the wall. Horton testified they took a very methodical approach to try to determine the source of the leaks. Based on how much water was in the pool and by crawling in the space between the pool and the building walls and floor, they could see where the water was coming from. At every level, the pool leaked. With just a couple of inches in the pool, water leaked from the seams of the liners. As the water rose, it poured out from

fittings and eventually the terminations as well.  Horton testified it was like a car wash in the garage.

After the work on the drains was completed, AquaTech put water into the four bottom drains only and there were no leaks.  Upon the addition of another inch of water, above the bottom drain level, water began to leak into the garage again.  At this level, the water was below the fittings and, of course, the top termination bar.  More water was added to the pool to cover the fittings, and water leaked from the lights and skimmers.  A leak was also discovered in conduit for the pool lights leading to the junction box.  AquaTech raised the junction box, filled the remaining space in the conduit, and sealed the conduit. These actions successfully stopped the leaking in the conduit to the junction box.

Throughout this process to determine the source of leaks, AquaTech and Krepel conducted air pressure tests which showed bubbles coming from the seams and fittings in the wall.  To catch the water leaking from the pool, GenTech hired a sheet metal company to fabricate large galvanized steel pans which were placed in the garage to catch the water. Bradford measured the amount of water leaking from the pool into the steel pans.  At one point, there were 200 gallons of water leaking from the pool per day.

Krepel's February 5, 2007 Field Report made the following assertions:  Krepel was back on site every day to make repairs from December 1 through December 8, 2006 and December 26 though December 29, 2006. Of particular note, on December 1, 2006, during an inspection of the pool liner, Krepel  found only one small cut in the wall of the pool liner which he repaired.  On December 2, repair work on the four bottom drains was completed.  They began filling the pool, and the leaking became much worse when the water level hit the lights and the handrail anchors

at the steps.  Water was leaking out of the back side of almost all the lights. (Krepel Field Report, P- 25A, NAT 88).  On December 3, 2006, they filled the pool to above the termination bar. There were "major leaks" in the skimmers above the termination bar.  (Krepel Field Report, Ex.P 25A NAT89).  An air test showed approximately 14 locations above the termination bar in the spa where there were leaks. ( P-25A, NAT 89).

On or about December 4, 2011, Carney, Krepel, and Dave Keim of Natare had a phone conversation about the leaking.  They agreed to apply a new type of caulking, an epoxy called Aquatapoxy, around the fittings in an effort to staunch the leaking. (P-25A, NAT 89).  Rose testified he recalled this conference call in which they agreed to the use of Aquatapoxy, but he could not remember who was to install it.  Krepel and Gentech employees both applied Aquatopoxy around the fittings, including the handrail fittings to try to stop the leaking. Krepel testified he did not suggest they use Aquatapoxy but he did not object. According to Krepel's Field Report, on  December 5, 2006, Krepel installed epoxy around all the penetrations in the spa.[7]  He also inspected the pool's seams, and fittings for possible problems and he again inspected the liner for possible cuts and found nothing. (Krepel Field Report, P-25A, NAT-89).

By letter dated December 5, 2006, Rose, Senior Project Manager for Natare, wrote Carney:

> Tom has informed me that to date he is sitting at about $4,700 in cost.  We wanted to give you a heads up prior to receiving a final invoice from us.  Please advise if you wish him to continue to be on site while the expoxy work is being done.

( P-17).

---

[7]The undersigned infers that the compression flanges around the fittings were removed to install the epoxy because Krepel states in his field report that the flanges were re-installed after the caulking.

On December 7, 2006, Krepel installed epoxy around all the penetrations in the main pool and then reinstalled the compression flanges. (Krepel Field Report, P-25A, NAT 89). He also found a hole in a pipe "as a result of installation of starboard flange." (P-25A, NAT 89). After the epoxying was finished and water was placed in the pool, Carney crawled between the pool shell and the building wall to see if the leaking had stopped. It had not. (*See also* Krepel Field Report, P-25A, NAT 89) ("the epoxy had little effect on controlling the leak.") Krepel performed an air test and found a leak in one of the flanges when he attempted to reinstall it. He removed the suspect flange and found that the concrete around that fitting was not suitable for holding an anchor. On December 8, 2006, Carney and Rose had a conversation regarding whether Krpel might have punctured the membrane.

On December 15, 2006, Libby Boyer, Project Coordinator for Natare, emailed Rose to ask him, "Has Tom finished at Siskin? Or will we know when he sends us a bill?" Rose responded, "He is not done. I doubt if he is going to be able to bill this as it is looking like warranty work." (P-17A). Michael Walsh, President of Natare, received a copy of this email. *Id*.

According to his Field Report, following his work on December 7, 2007, Krepel did not return to Siskin until December 26, 2006. (Krepel Field Report, P-25A, NAT 90). He began replacement of the spa wall. He noted an exceptional amount of dirt and concrete slurry on the liner. *Id.* On December 27, 2006, the spa was filled and it "immediately leaked from the same locations." *Id.* He "demanded a pressure test." *Id.* The pressure test revealed one set of lines would not hold and he removed the flanges around the suspect areas, removed the concrete, and found a hole in a pipe. *Id.* Brad Carney testified that three holes were found in one of the

drainage pipes in the wall of the spa. Krepel had punctured the pipe when he was drilling the anchor holes for the termination strips. AquaTech had to chip the concrete out around the pipe, repair the pipe, and then repair the concrete.

On January 3, 2007 at about 3 pm, Rose emailed Walsh concerning the conference call he, JAB, and MAT[8] had conducted earlier that day with Carney. (P-18A). Rose requested Walsh look at some photos of the project to see if he could detect any problems. Rose also stated he told Krepel "we are expecting him to find any cuts or missed seams in the liner," and "he really does not want us to find it [any problems with the pool] for him as his insurance company will have to take care of the expense." Krepel indicated to Rose he would be willing to provide free labor to redo the entire project if need be. *Id*. Rose closed stating, "[t]hey addressed again that it may be beneficial in the owner's (hospital's) eyes for someone from the office to come down there and meet with everyone." *Id.*

Rose emailed Carney on January 3, 2007 at 5:19 pm. Rose indicated he, as well as others at Natare including the president, Mike Walsh, had reviewed the pictures. Rose stated:

> We have come to the conclusion that in regards to the pool leaking that you are experiencing with only a couple of inches deep in the pool, there are only four possible sources. They are:
>
> 1.     There is a seam in the liner that is not properly sealed. This could be either a floor seam or a floor to wall seam.
> 2.     Due to the concrete/tile work that went on after the membrane was originally installed, there could be multiple cuts in the floor of the membrane.
> 3.     The test fittings (pump outs) have been comprised and may be leaking.
> 4.     There may be some type of pipe leak that is leaking into the pool shell.

---

[8]The Court does not know who JAB and MAT are except that they are employees at Natare.

(P-18, GT 41). Rose indicated he would send Krepel back to the site to check all seams, look for cuts or nicks in the liner, and check the test fittings to insure they had not been compromised or cracked. Rose further expressed concern about the handrails opining their "failing anchors that are in the pool are sure to leak" and may be the main source of the leaking. Rose suggested re-anchoring the handrails using a flange anchored flush to the pool bottom. (P-18). The new anchors would have a pole welded to the flange into which the handrail would be inserted. On January 4 and 5, 2007, Rose emailed specifications for the new handrail anchors to Carney. ( P-18, P-19, P-20). Rose testified the handrail anchors were not Natare's responsibility. Carney testified that Krepel attempted to install the new anchors for the handrails but he was not able, and he asked AquaTech for help so AquaTech installed the new handrail anchors. That did not stop the leaking. Carney testified that AquaTech made every change Natare suggested in an effort to stop the leaking, but nothing worked.

Several times during this process of trying to find the leaks, AquaTech conducted an air pressure test on the liners. To conduct the test, AquaTech put "slip sheets" on the floor drains to make them water tight and added one foot of water in the pool, a level which was below the fittings in the wall and the top termination bar where the liner ends. Air was then pumped in between the concrete and the liner. Carney testified that Krepel pumped the air under the liner and decided how much pressure to use. Air bubbles came up between the seams of the liner indicating the seams themselves were leaking. In an attempt to stop leakage at the fittings, Krepel caulked around all the fittings, but it seemed to make no difference in the water leakage problem. Bradford testified that the caulking completed by Krepel was sloppy and constituted poor workmanship. After seeing Krepel's poor caulking job, AquaTech hired a subcontractor it knew

to be a very good caulker to finish caulking around the light fixtures in the pool and spa.  Krepel was aware of this and did not object. Other evidence of poor workmanship on the part of Krepel included bubbling beneath the liner on the pool steps.  Krepel cut the liner at the step where the bubbles were in an attempt to eliminate the bubbles.  He then sealed the cut with caulk.

On January 3 and 4, 2007, Krepel came to the site to look for nicks or cuts in the lining.  Carney testified Krepel found none.   In a letter dated January 9, 2007, Rose wrote Carney that he was, "as requested," sending Carney details of two different ways to "terminate the membrane [liner] system"  at the Siskin pool.  (Ex. P 21).  Each detail involved terminating the liner above the tile band and just under the coping at the top of the pool. *Id.*

In an email dated January 16, 2007, Rose wrote Libby Boyer, Project Coordinator at Natare, that Krepel had asked for certain materials including rolls of liner to be shipped to Siskin.  (P-20A). Boyer emailed back asking "[a]re these materials billable or is this considered warranty? *Id.* Rose responded, "Warranty."  *Id.*

On January 17, 2007, Scott Caldwell of Natare emailed Carney that Krepel was going to be onsite January 18, 2007,  and will "totally replace the membrane in both the pool and spa," and he advised to make sure no-one is allowed in the pool or spa to prevent accidental cuts to the membrane with debris in their shoes. (P-22).  Caldwell further stated:

> It is our understanding that the owner has opted to leave the termination below the tile.  We will do all that we can to insure that the membrane system is watertight, however, we cannot be responsible for what happens above the termination.  We are a little concerned with this as the existing termination has been removed a couple of times and the concrete and anchors may be compromised.

(P-22).  According to Krepel's Field Report, he next returned to the Siskin pool on January 19, 2007.  "  (Krepel Field Report, P-25A, NAT 90). From January 19 to January 21, 2007, Krepel

installed the new liner in the spa. On January 20, 2007, the termination bars in the pool were removed and "replaced using aquatapoxy." (Krepel Field Report, P-25A, NAT 90). On January 21, the spa was filled and "had an immediate leak around a skimmer pipe.") (Krepel Field Report, P-25A, NAT 90). On January 22, 2007, with the water level in the spa "just below the tile ... the leak stopped." (Krepel Field Report, P-25A, NAT 91). Then the main pool was drained and Krepel found about 30 holes in the liner on the floor of the pool. (Krepel Field Report, P-25A, NAT 91). From January 23, 2007 to January 27, 2002, Krepel replaced the liner in the pool. Also during this time he, as well as Bradford of GenTech, caulked around all the fittings and terminations with epoxy. On January 26 and 27, 2007, Carney and two employees installed the new handrail anchors. (Krepel Field Report, P25A-NAT-91). On January 29, 2007, Krepel met with "Rob (customer)," Carney, and Duane Horton. Siskin was not pleased with the sealant above the termination bars which had turned white. It was decided they would put a dark blue sealant over the white sealant in the pool. (Krepel Field Report, P-25A, NAT 91). There were no more daily entries in Krepel's Field Report after January 29, 2007. In his "overview" Krepel opined:

> The shell of the pool will not hold water unless everything is switched out to vinyl liner fittings and the termination is raised. This would put all liability on us. As is [sic] turns out they would not follow any of our recommendations and therefore, the pool is leaking. We should have no responsibility for anything but the liner itself. AquaTech and GenTech have taken off and reinstalled all flanges, termination strips, and main drains.

(Krepel Field Report, P-25A, NAT 91). Krepel concluded, "I believe this may be the job of all jobs." (Krepel Field Report, P-25A, NAT 91).

At trial, Carney strongly contested Krepel's contention that Krepel had found 30 holes in the pool liner. According to Carney, Krepel had pointed out only two places where he said there were holes. Carney also testified Krepel did not replace any of the termination bars at the top of the pool or any of the compression flanges around the fittings. When he replaced the first liner, he simply put the second liner on top of the first and brought the second liner to the edges of the first liner. Krepel used a heat gun to meld the second liner onto the first. Krepel also used caulk on the second liner under the termination bar. AquaTech then put some water into the pool and the leaking in both the pool and spa continued. In some instances, the second liner began to pull away from the first and the caulking had cracked. Water continued to leak from the fittings. At this point, the pool was leaking 120 gallons a day. At trial, Horton, Carney and Bradford all denied that construction debris was thrown into the pool. Duane Horton and Brad Carney tried repeatedly to get someone from Natare to come to Chattanooga to look at the project, but no-one from Natare would come.

On January 22, 2007, Boyer emailed Rose to ask if Natare would charge AquaTech for shipment of the materials to Siskin. (P-22A). Rose responded, "We will pay for now." *Id.* On January 30, 2007, Rose emailed Carney concerning a discussion they had had that same day regarding "clear sealant" used in the pool and spa which had turned white. (P-22B). Rose concluded water had been added to the pool before the sealant had cured causing it to turn white. Rose stated at least eight hours were required for the sealant to cure. *Id.* Rose further stated Natare no longer made the blue sealant he had asked about but Natare had two old cans which he could not guarantee would be effective. Rose offered to send the blue sealant but advised Carney should test it first on some scrap material. *Id.*

A Daily Report prepared by GenTech supervisor Jim Allyn on January 30, 2008 indicated that Allyn worked with Krepel to change out pool lights and to clean up scuff marks on the pool liner made by workmen walking on the liner. (D-65).

On January 31, 2007, Rose emailed Carney, "You have just informed me that additional water was added and now there is a leak in the stair area. Based upon our conversation, you are going to proceed with filling the pool to the bottom of the termination to insure there are not any additional problems." (P-23). Rose stated he would let "our installer" know what was going on and Carney should contact Natare immediately if he found additional problems or discovered the source of the leak. *Id.* A few minutes later, Rose emailed Carney stating he had informed "our installer" of the leak at the stairs, and Krepel thought the problem might be that the screws which AquaTech installed may not be completely compressed down. Rose noted if this was not the problem, the source of the leak needed to be found. (P-24).

On February 1, 2007, Rose emailed Carney to "confirm" an earlier conversation regarding leaking at the stair and skimmer area. (P-25). Rose thought the water around the skimmer area might be attributable to the underlying fleece being saturated earlier. Rose stated he would like to send Natare's installer to inspect the work and if this approach was not successful, they would send someone from his office to meet with the appropriate people on site. *Id.* Rose stated Carney had told him (Rose) that he (Carney) had a plan to present to the owner tomorrow to try to correct the problem. Rose cautioned to be careful in order to avoid creating another problem. *Id.*

The next written communication between Rose and Carney was a letter sent by fax on February 6, 2007. In the letter, Rose expressed regret that there were continued problems with

the pool liner system installation. He opined that elevated pools were harder to construct than in-ground pool and stated, "[e]very pool leaks to some extent." (P-26, GT 58). He further stated in relevant part:

> There is no doubt that certain errors were made, both in pool construction and liner installation. Clearly, our installer inadvertently punctured certain lines that were located below the surface in the spa. At the same time, the wrong anchor sockets were used for the pool rails, and the wrong inlet, drain and light fittings were used during the construction of the pool. Apparently, there was some confusion as to the requirements in that regard. While it is possible to flange around pool fittings, it is always best to used [sic] vinyl liner fittings during original construction. The probability of success in making a water tight termination is significantly higher when such fittings are used.

> Furthermore, certain details such as the termination below the ceramic tile were not good choices. While such terminations can be accomplished, they are more difficult and problematic. Perhaps we made a mistake in not being more adamant and demanding with regard to the original pool construction.

(P-26, GT 58). Rose went on to say that workmen on the construction site had damaged the liner and that he was still waiting for recent photos of areas of concern. Rose stated "[y]ou have asked also asked about the possibility of a visit to the project by one of our engineering or technical staff members, which we are willing to do, but it is important to have a complete understanding of the current issues and concerns before such a meeting is scheduled." (P-26, GT 58). Rose stated that at such a meeting "our installer" should be present so that an action plan can be developed and implemented, should such a meeting prove necessary." (Ex. P26, GT58). Rose closed with the invitation to contact him should Carney have any questions or require additional information. (P-26, GT 58).

Carney responded to Rose by emailing and faxing a letter dated February 8, 2007 to Rose in which he stated he has received Rose's February 6, 2007 letter and listed several "items" that

were unacceptable to AquaTech. (Ex. P29). Carney's concerns included: 1) water is still leaking well below the termination strips, especially on the steps; 2) the initial handrail anchors installed by AquaTech were the same anchors shown in Natare's submittals of June 2, 2006 for the work to be done at Siskin; 3) the handrail anchors were later replaced according to Natare's specifications; 4) Natare told AquaTech before installing the liner that concrete fittings were sufficient and Natare's June 2, 2006 submittals show the Natare liner compressing around concrete fittings; 5) every fitting leaked water after the first installation indicating the initial compression was insufficient; 6) Natare's installer punctured some of the drainage pipes in the spa wall which AquaTech repaired at its own cost; and 7) despite repeated requests and demands from AquaTech, no-one from Natare had visited the site. (P-29). "I would highly recommend making a site visit prior to making allegations as you did in the February 6, 2007 letter." (P-29). Carney indicated that after working several months to fix the problems, the project "has now reached a critical point." *Id.* Carney gave Natare 72 hours to correct the problems with the pool or provide adequate assurances that Natare will correct the problems in a satisfactory manner. Carney stated if Natare failed to do either, AquaTech would request a full refund and hold Natare accountable for any additional costs incurred by AquaTech to fix the pool and for damages caused by delays. (P-29).

On February 8, 2007, Rose faxed to Carney another letter in which he indicated he had received the pictures sent by Carney. (P27, GT 63). Rose noted Carney's concern about an inlet near a handrail and a "suspect" seam. Rose said he had tried to contact Carney unsuccessfully by phone that day and "[u]nfortunately, we were not able to identify exactly what you are trying to

convey to us in the picture." (P-27, GT 63). Rose repeated his opinion that workmen had damaged the liner after its installation. Rose stated,

> At this juncture, we need to hear from you as to what problems you believe are directly related to the PVC lining system and our work... If you can tell us your concerns and provide a schedule when the pool or spa can be drained, we will have personnel return to the project and correct anything related to our system.
>
> ***
>
> We are waiting to hear from you regarding the status of the project and a schedule to address any concerns you or the Owner may have with the pool and spa lining system. Please let us hear from you as soon as possible.

(P-27).

Carney responded by faxing a letter to Rose on February 9, 2007. (P-28). He reiterated many of the same concerns he had in his February 8 letter and added other concerns including: 1) the concrete fittings used in the pool were verbally approved by Natare before installation; 2) Natare was aware of and did not object to the tile band before installation, 3) the main drains installed were shown in Natare's June 2, 2006 submittals, 4) there was a leaking seam in the original pool liner, 5) the installer showed him only two holes in the original liner, 6) the replacement liner still leaks, 7) the installer applied water to the sealant before it cured causing the sealant to turn white, and 8) attempts to cover the white sealant with blue sealant have been unsuccessful. (P-28).

Rose faxed a letter to Carney February 9, 2007 in response to Carney's February 8, 2007 letter. Among other matters, he stated that 1) the cause of the water leak has not been identified; you cannot identify a leak by looking at the pool; 2) "the initial hand rail anchors shown in our submittal would have been completely adequate had your concrete or gunite work been adequate to ensure that the pool shell was not leaking;" 3) AquaTech "unilaterally changed the top

termination to tile which was likely a source of leaking; 4) "you have removed, modified, altered, and reinstalled many of our terminations without our permission or supervision thereby compromising the integrity of the pool lining; 5) leaks may be coming through the concrete between the compression flanges around the concrete fittings and the fittings themselves because the concrete is not waterproof; 6) Natare told AquaTech that vinyl fittings were "more appropriate" but the concrete fittings had already been installed; 7) our installer asked where the pipes were in the pool and AquaTech wouldn't tell him or give him an "as-built drawing;" 8) AquaTech installed piping where it knew lining would have to be anchored; 9) as for site visits, "Natare's installer" has been on site "numerous times." (P-30). Rose stated Natare was making arrangements to be on site on February 12, 2007 to inspect, identify, and repair any deficiencies in its work.

On February 12, 2007 Carney responded to Rose with a letter by email and fax. (P-31A). Carney noted they had talked on February 8 and 9, 2007. He responded with the following points: 1) they can see the leaks by crawling into the space between the pool shell and the building wall, 2) Natare never said the concrete shell had to be waterproof; that's the purpose of the liner as explained in Natare's own literature; 3) in Natare's April 10, 2006 Quotation and Agreement, Natare stated it would inspect the pool surfaces to insure that a satisfactory base has been provided for the installation of the membrane system; 4) Natare has not installed a new termination, just a new liner up to the edge of the original termination; 5)AquaTech has attempted to seal the top terminations and anchors because the installer said he was leaving those items to AquaTech; 6) the pool leaks at the termination *below* the tile; 7) in a conference call on December 4, 2006, with Carney, Duane Horton, Krepel, Rose, and Dave Keim; Keim gave

approval to AquaTech to apply Aquatapoxy to all underwater compression areas; this work has succeeded in stopping leaks at the inlet fittings, drains, and lights, 8) AquaTech called Dave Keim *prior* to the installation of the concrete fittings to verify that concrete fittings were appropriate; Keim confirmed they were; and 9) the installer never asked about the location of pipes and drilled far beyond the necessary depth for the termination anchors. (P-31A). Carney informed Rose that Natare had until the end of the business day to complete repairs. (P-31A).

On February 13, 2007, David Markey, an expert in the design and construction of commercial pools and waterparks (P-59A), inspected the Siskin pool and spa at AquaTech's request. Markey opined that it was Natare's responsibility to fix any leaks from "normal pool penetrations" such as inlet fittings, light niches, and drains. (P-33).

The next correspondence, sent by both fax and email, between Natare and AquaTech is dated February 16, 2007. Carney wrote to Rose that Natare had not responded to his February 12, 2007 letter, and Tom Krepel had been onsite since February 12, 2007 and had been unable to stop the leaks. Carney stated that because Natare cannot resolve the leaks in a timely manner, AquaTech had no choice but to look for other means to resolve the leaking and was terminating all agreements with Natare. (P-36). At this point, Natare had already received 90% of its original contract price. Carney testified that GenTech's and AquaTech's combined costs incurred in attempting to repair the leaking problems with Natare's pool liner system to be $41,912.29. (P-53).

Rose responded faxing a letter to Carney on February 16, 2007 in which he again stated none of the leaking problems were Natare's responsibility nor was it Natare's responsibility to determine why the pool was leaking. (D-66A). Rose again asserted primarily that the leaks

were caused by a "leaking pool shell" and damages done by workmen to the liner after it was installed. Rose stated Natare had spent "tens of thousands of dollars in extra costs during our efforts to assist you with this project" and Natare would be submitting its charges and expected prompt payment." *Id.* Carney testified AquaTech did not respond to this letter because AquaTech had already terminated the contract with Natare. Carney also testified Siskin never accepted the liner system provided by Natare because it always leaked. Bradford testified that had Natare made suggestions about changing out the concrete fittings with vinyl fittings or removing the tile band, they would have done so, but no such suggestions were made. Carney also testified that had Natare recommended AquaTech replace the concrete fittings with vinyl fittings, AquaTech would have done so. Krepel testified that he told AquaTech numerous times that the top terminations for the liner should be raised to just under the coping, but AquaTech refused to do so.

Horton testified that over the months that they attempted to repair the leaks in the pool and the spa, he tried "exhaustively" to get someone from Natare to come see the project, but no-one would come. Horton testified that though they had already paid Natare a significant portion of the contract price for the liner, given the costs of litigation, GenTech and AquaTech decided to simply walk away from Natare without seeking legal recourse. It is undisputed that no executive or personnel from Natare ever came to the Siskin project site.

AquaTech contacted RenoSys, a rival company of Natare, about installing a new liner system in the Siskin pool and spa. (P-32, P-35). On February 19, 2007 Jeff Wells, an officer of RenoSys came to look at the pool and spa. Subsequently, AquaTech and RenoSys entered into an agreement for RenoSys to install a new liner system in the Siskin pool and spa on February

27

21, 2007. (P-37). Wells recommended the following alterations be made to the pool and spa before the RenoSys liner system was installed: remove the tile band, replace the plastic recessed steps with metal steps, and replace the concrete fittings with vinyl fittings provided by RenoSys. (P-37, GT 106). The last two recommendations were considered "optional and [] not required by RenoSys to guarantee a watertight lining system." (P-37, GT 106). AquaTech decided to make the recommended alterations.

A crew hired by GenTech cut the Natare liner, including the underlying felt, into pieces and took it to the dump. RenoSys sent an installer, Mr. Runkel, an independent contractor. He brought two workers with him. Before beginning installation of the new liner, RenoSys recommended and AquaTech followed this recommendation to install six new handrails. (P-38, 40). Because there were three people hanging the strips of liner, they were able to use much larger strips thereby cutting the number of seams down by about two thirds, according to Bradford. Bradford testified that Runkel's craftsmanship was superior to Krepel's.

After installation was complete, AquaTech filled the pool and spa with water. There was some leakage at some of the lights and one of the recessed steps, but the leakage was considerably less than with the Natatec Swimming Pool Membrane System. Carney testified the leakage was about 30 gallons per day. To fix the leaks, RenoSys put PVC caps over the lights. This completely eliminated the leaks, but it was only a temporary fix. Siskin needed the pool open for business and agreed to wait until December 2007 when the pool was not being used as much to make permanent repairs. In December 2007, AquaTech installed nichless lights at RenoSys's suggestion. After this installation, there were no leaks initially. Currently, the pool leaks about 10 to 15 gallons a day. Nevertheless, Siskin has accepted the work and is satisfied

with the pool and spa.   Carney testified RenoSys's installer was very knowledgeable and efficient.

On June 5, 2007, Natare filed a Mechanic's and Materialmen's lien in the amount of $47, 156.45 pursuant to Tenn Code. Ann. § 66-11-101 *et seq*. for work performed and incorporated into the property located at One Siskin Plaza, Chattanooga, Tennessee." (P-43).

Siskin Hospital subsequently assigned to GenTech and Natare all warranty rights it had under the written warranty provided by Natare. (P-70, the assignment of rights; P-11, the written warranty).

At trial Natare CEO and President Mike Walsh testified concerning why he thought the liner leaked and why he believed it was not Natare's responsibility.  Walsh testified as follows: Natare's PVC liner is "virtually indestructible" when used properly in a pool system, but it is not intended for construction purposes.  Walsh opined that some of the leakage was caused by holes put in the liner by workmen putting construction debris on it or walking across it with debris stuck in their boots.  However, Walsh took the position that the majority of leakage was cause by poor concrete work on the part of GenTech and AquaTech in constructing the shell.  Walsh testified that when a wall is constructed of shotcrete, concrete is blown under pressure onto the steel work of the wall.  Some of this concrete bounces off the wall, and this product is called "rebound."  Walsh testified it has been his experience that workers will sometimes pick up this rebound and attempt to reuse it by packing it around the fittings.  Rebound, however, has lost its tensile strength and is less dense than the rest of the concrete.  It is very difficult to screw flanges into rebound.  As a result, the installer cannot achieve good compression around the fittings and

leaking occurs. The only way to repair this problem is to chip out the concrete and fill it in with a very dense, hard grout.

Gene Bradford testified he had never heard of rebound. He testified that the fittings were placed on the pipes in the wall frames and shotcrete was put around the fittings.

Walsh also explained that before a flange is placed around a fitting, the installer applies a silicon mastic on the bottom of the flange, places the flange around the fitting, and anchors it with screws. When the flange is compressed onto the wall, some of the mastic is squeezed out. The installer then takes his finger and smooths out the excess. There is about a 1/4 inch circle of concrete left exposed between the flange and the fitting. Walsh testified Natare is not responsible for ensuring that the circular portion of exposed concrete around the fitting is watertight, that Natare assumes this portion of concrete is watertight. According to Walsh, if the concrete is not watertight, it is very difficult to make it watertight with caulk. Walsh further testified there is nothing inherently bad about tile, but sometimes the grout can leak and the tiles can crack causing leaks. Walsh denied that Natare ever refused to send anyone from Natare to the jobsite, but he also stated that the installer knows the job the best and is the best one suited to find leaks. Walsh admitted he had never been to the jobsite himself.

The case is factually very dense. What is clear, however, is that Natare's sales literature promised a watertight pool if one used its Natatec Swimming Pool Membrane System, even in a pool supported by a concrete shell. Natare's sales literature specifically stated concrete is not watertight. AquaTech relied on these representation when it contracted with Natare for Natare's pool liner system to be installed in the Siskin pool and spa. It is also clear that from the moment the pool and spa first contained any water at any level, they leaked.

Prior to the construction of the concrete shell, AquaTech received approval from Natare to use concrete fittings. Concrete fittings were part of the contractual agreement between AquaTech and Natare. AquaTech anchored the handrails in the manner recommended by Natare's sales literature. Long before Krepel arrived to install the liner, Natare knew about the tile band and had no objection to it. Prior to installation of the liner system, Krepel looked at the pool and spa concrete shell and had no objections to the concrete, the fittings, anchors, drains, or tile work used in the Siskin project. Krepel even recommended use of tile around the recessed steps, and AquaTech complied with that request.

Once water was added to the pool and spa, they both leaked from the liner itself and from all the fittings, the handrail anchors, and at places in the terminations. In the pool where the tile band had been installed, water leaked from the terminations *below* the tile band. The leakage with the Natatec Swimming Pool Membrane System was significant – 200 to 120 gallons per day. Natare's own executives, Rose and Keim, and Natare's installer, Krepel, agreed to and approved the use of caulking in an attempt to staunch the leaking. Some these efforts were successful; some were not. Leaking from the fittings, anchors, and terminations were caused by one or more of the following: (1) failure on the part of Krepel to properly anchor the flanges, (2) leaks in the concrete itself in between the fittings and the flanges, and (3) concrete which failed to provide a good "bite" for the flange anchors which could not then compress the flanges tightly onto the membrane.

To the extent that the concrete itself was a problem, Krepel failed to properly inspect the concrete around the fittings, the handrails and on the walls to insure that a satisfactory base had been provided for the installation of the membrane system. There is no evidence in the record

that Natare told AquaTech that the concrete work was a problem until February 9, 2007. Natare consistently and stubbornly took the position that it was not responsible for leaks or for finding the leaks, and any problems with the Pool lining system's ability to compress on the liner because of the concrete was not its problem.[9] To the extent there were leaks in the liner, I find that most of these leaks were in the seams. During the air pressure tests, bubbles could be seen coming from the seams. While initially a couple of leaks were found in the liner elsewhere, those were successfully repaired, but those successful repairs still made no significant difference in staunching the leaking. On December 5, 2006, and on January 3 and 4, 2007, when the pool was experiencing significant leaking, Krepel inspected the pool for cuts in the liner and found nothing. On January 17, 2007, Natare had made the decision to replace the first liner in the pool and spa. According to Krepel, he found 30 holes in the pool liner on or about January 22, 2007. Carney says he found two. I credit Carney. In any event, whether there were two or 30 holes in the first liner at this point made no difference since the pool had leaked significantly when Krepel could find *no* holes in the pool liner and, when Krepel said he found 30 holes, the first liner was to be replaced.

Krepel accidentally punctured in three places a drainage pipe embedded in the concrete of the spa when he installed the terminations in the spa. I do not credit Krepel's testimony that he asked about placement of the pipes in the pool and spa before installation and was given no answer. The evidence indicates that AquaTech and GenTech were very eager during this entire

---

[9]The Court strongly suspects that had Natare just told AquaTech before February 2007 that it needed to replace the concrete fittings with vinyl fittings or that it should chip out the concrete around the fittings and replace it with hard, dense grout then AquaTech would have done so at its own cost as AquaTech was desperate to repair the pool and spa.

process to use Natare's expertise and advise in building the pool and spa, and the Court finds it incredible that Krepel would have asked Carney or Bradford for important information that they would fail to supply. Rather the Court credits Carney's testimony that Krepel never asked about the pipes in the wall.

To the extent that the leaks in the pool from the bottom drains and the leak from the conduit pipe leading to the junction box were caused by AquaTech or GenTech, those leaks were repaired and were not a source of the subsequent 200 to 120 gallons of water leaking from the pool.

Placement of the second liner over the first was an utter failure. Since the fittings and terminations were not replaced, many continued to leak. The second liner began pulling away from the first liner which would also have caused leaking because the first liner was not watertight.

With the exception perhaps of the tile band, AquaTech followed every recommendation Natare made in an effort to fix the leaks. AquaTech followed Natare's recommendations to make certain changes to the main drains and use stainless steel flanges. AquaTech followed Natare's recommendation to use a different kind of anchor for the handrails. Natare never recommended that the concrete around the fittings be chipped away and replaced with hard dense grout or that the concrete fittings be replaced with vinyl. The recommendations regarding the tile band were not made until sometime after the first liner was installed, and it does not appear from the record that this recommendation was strongly made. In any event, Horton testified that leaks through the tile band were not the reason GenTech and AquaTech terminated the contract with Natare; the leaks below the tile band were a sufficient basis to terminate the contract.

I do not credit Mike Walsh's testimony that AquaTech never asked anyone from Natare to come to the Siskin project. The record is replete with such requests. As early as April 2006, AquaTech requested that Natare send someone with technical expertise to the Siskin project to inspect the concrete shell. These requests intensified in late January and early February. Rose seemed to indicate Natare would send someone, but it never did. Rose told Carney that Natare would not send someone until Carney told him what the problems were for which Natare was responsible. Carney would tell him what he (Carney) thought were problems for which Natare was responsible, and Rose would respond that Natare was not responsible. Carney made attempts with Rose to resolve matters to no avail. Natare had become intractable in its position that the leaks and finding the leaks were not its responsibility. AquaTech had no choice but to remove the Natatec Swimming Pool Membrane System and look to another contractor for help.

### III. Analysis

Plaintiff AquaTech brings claims against Natare for breach of contract, breach of an express warranty, breach of implied warranty of fitness for a particular purpose, breach of an implied warranty of good faith and fair dealing, violations of the Tennessee Consumer Protection Act, and exaggeration of a lien amount.[10] Natare brings counterclaims for breach of contract, quantum meruit, and violations of the Prompt Pay Act. The parties agree Tennessee law applies.

---

[10]The Quotation and Agreement which is the contract between the parties in this case is signed by Brad Carney, but the name of the purchaser company is listed as "GenTech." At trial, the Court asked counsel for the parties if there was any dispute that the contract was between AquaTech and Natare. Counsel informed the Court there was not. Therefore, the Court is proceeding on that basis.

A.  Affirmative Defenses to Plaintiff's Breach of Contract and Warranty Claims

*1. The Disclaimer Provisions in the Quotation and Agreement and
the Application of the UCC*

Natare asserts that plaintiff's breach of warranties and breach of contract claims are

barred by provisions of the Quotation and Agreement. Paragraphs 7 and 8 in the Terms and

Conditions of the Quotation and Agreement provide in relevant part:

> ... Natare expressly disclaims any implied warranty of merchantability.  Natare
> further expressly disclaims any implied warranty of fitness for a particular
> purpose.
>
> ... Failure of Purchaser to provide to Natare written notice of defect within ten
> (10) calendar days after delivery or completion of installation, if applicable, shall
> constitute irrevocable acceptance of materials and workmanship by Purchaser and
> an admission and acknowledgment by Purchaser that the materials and
> workmanship so furnished fully comply with all terms, conditions, and
> specifications of this Quotation....

(P-2, GT 2, par. 7 and 8).

There is no dispute that more than ten days elapsed from Krepler's completion (initially)

of the installation of the pool liner and when AquaTech first filled the pool and discovered it

leaked.  The question is whether these disclaimer provisions bar this action.

Under the Uniform Commercial Code (UCC) in Tennessee, which applies to the sale of

goods, *see* Tenn. Code Ann. § 47-2-102, implied warranties of fitness for a particular purpose are

excluded only if the exclusion is in writing and is conspicuous.  Tenn. Code Ann. § 47-2-316(2).

The UCC defines conspicuous as:

> "Conspicuous," with reference to a term, means so written, displayed, or
> presented that a reasonable person against which it is to operate ought to have

noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(A) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language

Tenn. Code Ann. § 47-1-201(10). The UCC, as codified by Tennessee statute, applies to transactions of goods. *See* Tenn Code. Ann. § 47-2-102. Goods are defined in relevant part as "all things (including specifically manufactured goods) which are movable at the time of identification to the contract for sale..." Tenn. Code Ann. § 47-2-105 (parentheses are original). The membrane system, with its underlying felt and PVC liner and its flanges, are movable at the time of the identification to the contract for sale and are therefore goods. However, the Quotation and Agreement also provides that (1) Natare inspect the pool surfaces "to insure that a satisfactory base has been provided for the installation of the membrane system" and (2) Natare install the pool membrane system. (P-2, GT 3). These terms of the contract do not constitute goods; they are services.

In such a situation, where the contract is a mixed contract for both goods and services, Tennessee has adopted the predominant factor test to determine if Article 2 of the UCC, as adopted by Tennessee statute, or Tennessee common law applies. *Hudson v. Town and Country True Value Hardware, Inc.*, 666 S.W.2d 51, 53 (Tenn. 1984). Under the predominant factor test, the contract is viewed as a whole to determine if the predominant assets to be transferred are goods or nongoods. "We think it preferable to adopt the test that views the transaction as a

whole. If the predominant assets to be transferred are goods, the UCC governs, but if the predominant assets are non-goods, the UCC has no application." *Id.*

In this particular case, whether the goods or the services are predominant is a difficult question. Natare does not argue that the goods, *i.e.*, the Natare's pool liner system, are incidental to the contract, and, conversely, AquaTech does not argue that the services, *i.e.*, the inspection of the concrete shell and installation, are incidental. And while the action itself arises from the alleged nonperformance of the services part of the contract, under the predominant factor test, the nature of the claim does not determine whether the UCC applies. If it did, the "divisible rule" would apply. Under the "divisible rule," a mixed contract is divided into goods and nongoods; the UCC is applied to those claims that arise from the goods portion of the contract, and common law is applied to the claims arising from the nongoods portion of the contract. *Hudson,* 666 S.W.2d at 53-54. But the *Hudson* Court specifically rejected the divisible rule in favor of the predominant factor test. *Id.*

Natare argues flatly, citing *Aluminum Vinyl Sales Co. v. Woertz*, 1993 WL 367125 *4 (Tenn. Ct. App. Sept. 30, 1993), that in Tennessee, "the general rule is that building and construction contracts are not included within Article 2 of the Uniform Commercial Code." (Paragraph 36, Defendant's Final Proposed Findings of Fact and Conclusions of Law, Doc. 68, Page ID # 1689). But the court in *Grundy County, Tennessee v. Harrison*, 1989 WL 5406 (Tenn. Ct. App. May 24, 1989) did not follow this "general rule." In *Harrison*, the court found a dispute regarding a contract for the replacement of a roof, where the roofer was to provide the materials as well as labor, was governed by the UCC pursuant to the dominant factor test. *Id.* at *3-4. Natare also cites cases from other jurisdictions in which a contract for the construction of a

swimming pool does not fall within the purview of the UCC. *See Anthony Pools v. Sheehen,* 455 A. 2d 434 (Md 1983); *Chlan v. KDI Sylvan Pools, Inc.*, 452 A. 2d 1259 (Md App. 1982); *Ben Construction Corp. v. Venbe*, 257 N.Y.S. 2d 988 (App. Div. 1965). The Court notes that in each of these cases, the contractor who was sued constructed the entire pool. In addition, none of the pools contained a liner system, the significance of which shall be discussed below. On the other hand, in *Riffe v. Black*, 548 S.W.2d 175 (Ky. App. 1977), the court did apply the UCC to a dispute arising from installation of a pool liner, though the court did not discuss the predominant factor test. Consequently, the Court concludes the only test relevant to the determination of whether the UCC applies, is the predominant factor test as articulated by the Tennessee Supreme Court in *Hudson v. Town and Country True Value Hardware, Inc.*, 666 S.W.2d 51, 53 (Tenn. 1984).

In the instant case, the Court finds it significant that Natare did not construct the concrete pool shell, install the fittings or pipes for drainage and for electrical lines, install the handrails or recessed steps, or build the platform around the pool and spa. Natare only agreed to inspect the pool shell to insure its suitability for the liner, provide the liner system, and install the liner system. As this lawsuit demonstrates, inspection of the pool shell and installation are important, but so are the goods themselves. If the goods are defective, no amount of inspection or good workmanship in the installation will produce the bargained-for result, a watertight pool. Moreover, Natare touts its product, the Natatec PVC Swimming Pool Membrane system, as a unique product specially manufactured by Natare. Natare's sales literature implies one cannot buy materials of equivalent or superior watertight characteristics elsewhere; the superior Natatec PVC Swimming Pool Membrane system can be bought from Natare only. Further, the value of

the goods, *i.e.*, the Natatec PVC Swimming Pool Membrane system (liner and flanges), significantly exceeds the value of installation. According to AquaTech's analysis, the cost of installation was $10,500 while the cost of the liner and flanges was $36,305.[11]  According to Natare's invoicing (*see* P-8 and P-10), the cost of the materials was $27,840 and the cost of installation was $18,965.  Either way, the value of the materials significantly outweighs the value of installation. The Court concludes this contract was one predominately for goods thus the UCC applies to the contract as a whole.

The disclaimers in paragraphs 7 and 8 relied upon by Natare were not conspicuous in the contract as required by the UCC to be valid.  The type is tiny, less than eight point.  The entire page is filled with paragraphs using the same size and style type making *everything* on the page, including the disclaimers, extremely difficult to read.  There is nothing to make the portions relied upon by Natare stand out in any way, and the Court concludes they do not apply.  In addition, a disclaimer will not apply where, as in this case, the parties did not bargain and negotiate the terms of the disclaimer itself.  *City of Harriman School Dist. v. Southwestern Petroleum Corp.*, 757 S.W.2d 669, 675 (Tenn. Ct. App. 1988).   Consequently, AquaTech's

---

[11]The total price for the pool membrane system and its installation was $46,805. (P2, GT-4). Krepel stated in his February 5, 2007 Field Report that the original cost of installation was $10,500. (P25A, NAT 92).  Subtracting the cost of installation from the total contract price leaves $36,305 for the price of the goods.

claims for breach of contract and breach of warranties are not barred by the disclaimer

paragraphs.[12]

### 2. The Written Warranty Provided on November 1, 2006

Natare argues that the written warranty provided to AquaTech on November 1, 2006 is

the only warranty applicable and that this express warranty bars all implied warranties.  This

November 1, 2006 warranty was not part of the contract between AquaTech and Natare.  Natare

cannot unilaterally limit valid warranties later by providing to AquaTech a written warranty

which purports to limit those warranties created (express or implied) by the Quotation and

Agreement. *Rice v. NN, Inc. Ball & Roller Div.*, 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006) ("It

is well established in this jurisdiction that a contract can be expressed, implied, written, or oral,

but an enforceable contract must, among other elements, result from a meeting of the minds...");

*Tropicana Pools, Inc. v. Boysen*, 296 So.2d 104, 108 (Fla. Ct. App. 1974) (warranties made at

---

[12]Even if the Court were to conclude that the contract was one predominantly for services, the Court would find the ten day written notice requirement does not apply.  First, Natare waived that requirement by treating at least some of the repair work performed by Krepel after the ten day period expired as warranty work. *See Fraught v. Fraught*, 730 S.W.2d 323, 325-26 (Tenn. 1987) ("Waiver is a voluntary relinquishment or abandonment of a known right or privilege;" intent to waiver a right may be implied, or inferred, or "appear as a legal result of, conduct"). Second, the Court also questions whether the ten day notice requirement is unconscionable given that it is an unusually short period within which to give notice of a defect, failure to comply results in the draconian waiver of all warranties including the express warranty, and the ten day requirement is hidden in a maze of fine print.  Third, the disclaimer paragraphs on page two of the Quotation and Agreement conflict directly with the promise in the contract of a "Ten Year Warranty" set out clearly (as opposed to the disclaimers) on page three of the Quotation and Agreement (P2, GT3).   If AquaTech must give notice of all defects within ten days of the completion of installation or accept all materials and installation as fully compliant with the terms and conditions of the Quotation and Agreement, then a Ten Year Warranty, even if limited, is meaningless. The Ten Year Warranty Agreement was negotiated and bargained for by the parties but the boiler plate disclaimers were not.  The Court has serious doubts as to whether, under such circumstances, the disclaimers would apply at all, even under common law.

time of initial bargain cannot subsequently be limited or modified by delivery of either printed or written documents unless agreed to by a party to whom the initial warranty extended.)  As succinctly stated by the Florida court

> It is 'hornbook law' requiring no citations of authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified; Subsequent modifications require consent and 'a meeting of the minds' of all of the initial parties to the contract whose rights or responsibilities are sought to be affected by the modification.

*Id.*

### 3.  The Defense of Substantial Completion

Natare argues that it could not have breached the contract with AquaTech because the project was substantially complete at the time AquaTech repudiated the contract.  In Tennessee, the termination of a substantially complete contract constitutes a material breach of contract since substantial completion of a project equates to substantial performance of the contract. *Howard G. Lewis Const. Co., Inc. v. Lee*, 830 S.W.2d 60,69 (Tenn. Ct. App. 1991), *overruled on other grounds by Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 928 n.7 (Tenn. 1998) (discussing prejudgment interest); *McClain v. Kimbrough Const. Co.,Inc.,* 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)*.*  To the extent that this affirmative defense of substantial completion applies under the UCC, the Court concludes the contract was not substantially complete.  Tenn. Code Ann. § 28-3-201 defines "substantial completion" as "that degree of completion of a project, improvement, or a specified area or portion thereof (in accordance with the contract documents, as modified by any change order agreed to by the parties) upon attainment of which the Owner can use the same for the purpose for which it was intended."  *Brookridge Apartments, Ltd. v. Universal Constructors, Inc.*, 844 S.W.2d 637 (Tenn. Ct. App. 1992).  The Court finds the pool

and spa never reached substantial completion under this definition while the Natatec Swimming Pool Membrane System was in the Siskin Pool and Spa, the Certificate of Substantial Completion not withstanding. The pool and spa leaked so badly they were not usable for the purpose intended; thus this affirmative defense fails.

### B. Breach of Contract Claim - Express and Implied Warranties

*1. Liability*

Under the UCC as codified by Tenn. Code Ann. § 47-2-317,

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

The implied warranty of fitness for a particular purpose under the UCC is codified in Tenn. Code Ann. § 47-2-315 which states in relevant part,

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose.

42

Natare contracted with AquaTech for the price of $46,805 to provide the Natatec Swimming Pool Membrane System.   Natare's sales literature, relied upon by Brad Carney in choosing the Natatec Swimming Pool Membrane System, expressly promised that if a customer used its Natatec Swimming Pool Membrane System,  it would have a watertight pool – one that doesn't leak.

Natare argues that its has successfully installed the Pool lining system in thousands of pools and that its materials were not the problem.  Natare has argued GenTech's concrete work on the shell was substandard and that it was this poor concrete work that caused the leaks, *not* its Pool lining system.  According to Natare, GenTech's poor concrete work caused two problems: 1) the flanges around the fittings and handrails could not be anchored sufficiently into the concrete wall to compress onto the pool liner and 2) the exposed concrete between the flanges and fittings leaked.  However, Natare expressly contracted to inspect the concrete shell to "***insure that a satisfactory base has been provided for the installation of the membrane system.***"   It also agreed to provide installation of the Natatec Swimming Pool Membrane System.   Natare knew that the underlying structure for the Siskin pool and spa were concrete shells and that the product to be supplied was to be installed over these shells *after* Natare inspected the shell suitability.  Natare impliedly warranted that the Natatec Swimming Pool Membrane System, as installed by its agent, would be fit for the purpose of making the two concrete shells *at the Siskin project* (as opposed to some other project) watertight.  Where poor concrete work caused leaks below the top tile border in the Siskin pool and spa, Natare's inspection through its agent, Krepel, was unequivocally inadequate as it failed to insure that a satisfactory base had been

provided for the installation of the Natatec Swimming Pool Membrane System.[13]  Poor

installation on the part of Krepel, Natare's agent, was also below commercial standards and also

rendered the Natatec Swimming Pool Membrane System inadequate.  There were multiple leaks

in the seams of the liner as well as around the fittings and handrails due to faulty compression by

Krepler.  He also failed to observe due care in the spa and punctured one of the drainage pipes

three times leading to serious leaks there.

The failure to inspect adequately and poor installation resulted in leakage of 120 to 200

gallons of water a day into the garage below.   As a result, the pool and spa were neither

watertight nor fit for the purposes for which they were intended.  The instant case is similar to

*City of Harriman School Dist. v. Southwestern Petroleum Corp.*, 757 S.W.2d 669, 675 (Tenn. Ct.

App. 1988), in which the school board contracted with a roofing manufacturer to provide roofing

materials to replace a leaking roof on a school.  The manufacturer's representative came to the

school, inspected and took pictures of the roof, and sent the pictures to the manufacturer.  Based

on the representative's erroneous report that the roof was two years old and based on the pictures

of the roof, the manufacturer recommended its Topcoat Roof System for the job.  The school

board followed the manufacturers' recommendation. However, because that the roof was actually

twenty years old, the Topcoat Roof System was not the right product for the job, and the roof

continued to leak.  The court stated that while "the Topcoat Roof System was merchantable and

[a] fit system for certain roofs, [t]he problem is that it was not the fit system for *this* roof."  *Id.* at

---

[13]Had a careful inspection revealed poor concrete work around the fittings prior to
installation, Natare could have refused to install the Natatec Swimming Pool Membrane System
until the concrete work was chipped out and repaired with hard dense grout or Natare could have
recommended the concrete fittings be replaced with vinyl fittings.  Natare did neither.

677 (emphasis original).   Such is the case here.  While the Natatec Swimming Pool Membrane System might be a fit system for many pools and spas, it was not a fit system for the *Siskin* pool and spa.  Consequently, the Court concludes Natare breached both the express warranty and the implied warranty to provide a watertight pool and spa for the *Siskin* project.

While there was some delay in putting water in the pool, it was not an unreasonable delay, and immediately upon putting water in the pool, AquaTech notified Natare that the pool and spa were leaking. The Court concludes this notice was made within a reasonable period of time after discovery of the breaches of warranties.  *See* Tenn. Code Ann. § 47-2-607 (requiring buyer to give notice of any breach within a reasonable time or be barred from any remedy.) Thereafter, AquaTech repeatedly sought assurances of performance from Natare and tried to work with Natare to fix the leaks in the Natatec Swimming Pool Membrane System, but Natare could not or would not make the needed repairs and eventually became entrenched in the position that the leaks were not their fault and not their responsibility to fix. As it did not receive seasonable and adequate assurances of performance from Natare, AquaTech was well within its rights to repudiate the contract with Natare for the Natatec Swimming Pool Membrane System. *See* Tenn. Code Ann. §§ 47-2-602, 47-2-608, 47-2-609.

### 2. Remedies for Breach of Warranties

AquaTech's remedies for Natare's breach are governed by Tenn. Code Ann. § 47-2-714 which provides:

> (1) Where the buyer has accepted goods and given notification (§ 47-2-607(3)) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Tenn. Code Ann. § 47-2-715(1) defines incidental damages as:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

The Natatec Swimming Pool Membrane System installed by Natare in the Siskin pool and spa was of no value to Siskin or AquaTech because the pool and spa leaked excessively. AquaTech is entitled to recover the $42,367.50 that it paid to Natare for the Natatec Swimming Pool Membrane System and for its installation in the Siskin pool and spa. AquaTech also engaged in significant efforts to repair the leaking. Natare was aware of the efforts and either expressly or impliedly approved of them. The Court also finds those efforts were reasonable under the circumstances. AquaTech is also entitled to recover as incidental damages those expenses incurred to repair the leaking pool and spa in the amount of $41,912.29. (P53).[14] Total damages to be awarded for breach of warranties are $84,279.79.

C. Tennessee Consumer Protection Act Claim

_____

[14]Even if the AquaTech were to prevail on its action for breach of warranty of good faith and fair dealing, it would not be awarded any more damages than it is entitled to for defendant's breach of express and implied warranties. Accordingly, the Court declines to address that issue as it is moot.

Under the Tennessee Consumer Protection Act (TCPA), "any person who suffers an ascertainable loss of money ....as a result of the use or employment by another person of an unfair or deceptive act or practice ... may bring an action individually to recover damages." Tenn. Code Ann. § 47-18-109(a)(1); *Davis v. McGuian,* 325 S.W.2d 149, 161 (Tenn. 2010). The TCPA defines a deceptive or unfair act as, among many other things, representing that goods have characteristics, uses or benefits that they do not have. Tenn. Code Ann. § 47-18-104(5). A misrepresentation does not have to be intentional; it can be negligent and still fall under the purview of the TCPA. *Faye v. Vincent*, 301 S.W.2d 162, 177 (Tenn. 2009); *Smith v. Scott*, 843 S.W.2d 9, 13 (Tenn. Ct. App. 1992). Upon a finding of a violation of the TCPA, the court may award reasonable attorney's fees as well as damages. Tenn. Code Ann. § 47-18-109(e)(1). If the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of the TCPA, the court may also award treble damages. Tenn. Code Ann. § 47-18-109(a)(3).

AquaTech asserts that Natare misrepresented the characteristics of its product in its sales literature by describing the Natatec Swimming Pool Membrane System as "a watertight impervious lining" for pools and water features. *(See supra* pp 3-5 for numerous references in Natare's sales literature to the Natatec Swimming Pool Membrane System as "watertight", "totally watertight," "completely watertight," and "waterproof." However, at trial both Glen Rose and Mike Walsh testified that "all pools leak." Walsh attempted to qualify this remark by stating, in effect, that while the Natatec Swimming Pool Membrane System itself wouldn't leak, the underlying pool structure for which Natare was not responsible would. This explanation is not convincing. The Court finds that the many statements in Natare's sales literature regarding the liner being watertight would cause a reasonable person to believe that a properly installed

Natatec Swimming Pool Membrane System will render the *entire* pool, including the underlying

pool structure, to be watertight, not just the liner. After all, consumers buy Natare's Natatec

Swimming Pool Membrane System to make the *entire* pool watertight. The Court concludes

statements in Natare's sales literature promising a *totally* and *completely* watertight liner that

*"can't leak"* for use in pools misrepresent the liner's characteristics and abilities, and such

misrepresentations constitute an unfair practice under the TCPA.

The Court also finds, based on Carney's and Horton's testimony, that AquaTech relied on

such statements in Natare's sales literature in choosing the Natatec Swimming Pool Membrane

System and suffered an ascertainable loss of money as a result. Consequently, AquaTech is

entitled to damages in the amount of $84,279.79, as previously discussed.

I do not, however, find that such misrepresentations were intentionally, wilfully or

knowingly made, and, therefore, treble damages are not appropriate.

AquaTech is also entitled to the award of reasonable attorney's fees for bringing this

action under the TCPA. To the extent that work plaintiff's counsel performed on other claims is

also applicable to plaintiff's TCPA claim, fees incurred for such work is compensable. Plaintiff

may not recover fees under the TCPA for attorney work solely attributable to claims other than

the TCPA. Plaintiff will be required to submit detailed invoices to support its claim for

attorney's fees and an affidavit from an experienced lawyer in this legal community supporting

the hourly rate charged by plaintiff's counsel.

D. The Exaggeration of Lien Claim

Tenn. Code Ann. § 66-11-139 provides:

If, in any action to enforce the lien provided by this chapter, the court finds that any lienor has willfully and grossly exaggerated the amount for which that person claims a lien, as stated in that person's notice of lien or pleading filed, in the discretion of the court, no recovery may be allowed thereon, and the lienor may be liable for any actual expenses incurred by the injured party, including attorneys' fees, as a result of the lienor's exaggeration.

On June 5, 2007, Natare filed a Mechanic's and Materialmen's lien in the amount of $47,156.45. Tenn. Code Ann. § 66-11-102(a) provides "there shall be a lien on any lot or tract of real property upon which an improvement has been made by a prime contractor and any remote contractor. *The lien shall secure the contract price.*" (Emphasis added.) At the time Natare filed its lien, AquaTech had already paid Natare $42,367.50 on the total contract price of $46,805.00. The work Krepel did in an effort to staunch the leaks in the pool and spa after initial installation was warranty work for which AquaTech should not have been billed. AquaTech did not owe Natare $47,156.45, and Natare wilfully and grossly exaggerated the amount of the lien arguably due Natare.

Further, the Court concludes that Natare may not recover on this lien in any amount and that AquaTech is entitled to recover reasonable attorney's fees for the maintenance of this action under Tenn. Code Ann. § 66-11-139. The same guidelines which apply to AquaTech's claim for attorney's fees under the TCPA apply also to this claim for attorney's fees under Tenn. Code Ann. § 66-11-139.

E. Defendant's Counterclaims

Natare brings counterclaims for breach of contract, quantum meruit, and violations of the Prompt Pay Act. Having found that it was Natare who breached the contract between it and AquaTech, that the Natatec Swimming Pool Membrane System was inadequate and unacceptable

49

in the Siskin pool and spa, that AquaTech had no choice but to replace it, and that AquaTech does not owe Natare any monies, Natare's claims necessarily fail.

### F. The Party in Interest

At trial the parties in this case agreed that the contract at issue, the Quotation and Agreement, is between AquaTech and Natare. GenTech is not a party to this contract. Since all rights afforded to AquaTech in this action arise from the Quotation and Agreement, the Court will award all damages, attorney's fees, and costs to AquaTech alone. If any party concludes this approach is in error, that party is invited to file a timely motion to alter or amend judgment which will be promptly addressed.

### IV. Conclusion

In conclusion, Natare is responsible for the leaky liner at the Siskin pool and spa. The contract at issue, the Quotation and Agreement, between AquaTech and Natare is governed by the UCC as codified in Tennessee. Pursuant to the UCC, Natare breached express and implied warranties, and AquaTech is entitled to damages in the amount of $84,279.79. Natare also violated the Tennessee Consumer Protection Act, and AquaTech is entitled to recover attorney's fees for maintaining its claim under the TCPA. Further, Natare grossly exaggerated the lien amount it filed on June 5, 2007 and, under Tenn. Code Ann. § 66-11-139, AquaTech may recover reasonable attorney's fees incurred to bring its claim under Tenn. Code Ann. § 66-11-139. Finally, Natare may not recover anything on the June 5, 2007 lien (P 43) it filed against Siskin Hospital's property.

AquaTech shall submit supporting documentation for attorney's fees incurred in pursuing its claims under the TCPA and Tenn. Code Ann. § 66-11-139 within sixty (60) days of entry of the final judgment in this case.

Final judgment shall be entered simultaneously with this memorandum.


_s/William B. Mitchell Carter_
UNITED STATES MAGISTRATE JUDGE